IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| *v.* | CIVIL ACTION NO. |
| $259,768.11 IN FUNDS SEIZED FROM BANK OF AMERICA ACCOUNT NUMBER XXXXXXXX9707 HELD IN THE NAME OF ALBERTO CORTES COSMETICS AND PERFUMES INC, | |
| Defendants. | |

## VERIFIED COMPLAINT FOR FORFEITURE

COMES NOW, the United States of America, Plaintiff in the above-styled civil action, pursuant to 21 U.S.C. § 881(a)(6), 18 U.S.C. § 981(a)(1)(A), 18 U.S.C. § 981(a)(1)(C), and 31 U.S.C. § 5317(c)(2)(A), and files this verified Complaint for Forfeiture, showing the Court as follows:

## INTRODUCTION

1.     On or about March 18, 2021, agents with the United States Department of Homeland Security - Homeland Security Investigations ("HSI") seized $259,768.11 in funds from Bank of America account number

XXXXXXXX9707, held in the name of Alberto Cortes Cosmetics and Perfumes Inc. (the "Defendant Funds").

2.     The Defendant Funds are presently located within the jurisdiction of this Court and in the custody of the United States Customs and Border Protection ("CBP").

3.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1345 and 1355.

4.     This Court has *in rem* jurisdiction over the Defendant Funds pursuant to 28 U.S.C. § 1355(b)(1)(A) because the acts or omissions giving rise to the forfeiture occurred in this district.

5.     Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A) because the acts or omissions giving rise to the forfeiture occurred in this district, and pursuant to 28 U.S.C. § 1395 because the property is located in this district.

## FORFEITURE STATUTES

6.     Pursuant to 21 U.S.C. § 881(a)(6), all moneys and things of value that were furnished or intended to be furnished in exchange for a controlled substance, that constitute proceeds traceable to such an exchange, or that were used or were intended to be used to facilitate the sale or exchange of a controlled substance in violation of 21 U.S.C. §§ 841 and 846 are subject to seizure and

forfeiture to the United States.

7.     Pursuant to 18 U.S.C. § 1956(a)(1)(A)(i), it is a crime for any person to knowingly conduct or attempt to conduct a financial transaction involving proceeds of a specified unlawful activity with the specific intent to promote the carrying on of a specified unlawful activity.

8.     Pursuant to 18 U.S.C. § 1956(a)(1)(B)(i), it is a crime for any person to knowingly conduct or attempt to conduct a financial transaction involving proceeds of a specified unlawful activity with the intent to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity.

9.     18 U.S.C. § 1956(c)(7) defines, in relevant part, a "specified unlawful activity" as any act or activity constituting an offense listed in 18 U.S.C. § 1961(1).

10.     18 U.S.C. § 1961(1) includes, as part of the list of offenses, "dealing in a controlled substance or listed chemical."

11.     Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in or traceable to a transaction or attempted transaction in violation of 18 U.S.C. § 1956 and/or 1957 is subject to forfeiture to the United States.

12.     Additionally, pursuant to 18 U.S.C. § 981(a)(1)(C), any property which constitutes or was derived from proceeds traceable to a violation of any

offense constituting a "specified unlawful activity" is subject to forfeiture to the United States.

## BASIS FOR FORFEITURE

### A. The Investigation

13.     Since on or about early December 2020, HSI began investigating a vast network of U.S.-based companies that have been receiving millions of dollars via bulk cash deposits in an unusually frequent and suspicious pattern since at least 2018.

14.     Most of the cash deposits occurred in cities historically known for drug trafficking activity, such as Los Angeles, Chicago, Atlanta, Miami, and New York City.

15.     The investigation revealed that those cash deposits were proceeds derived from suspected narcotics trafficking, and that the companies receiving the deposits laundered the funds as part of a Black Market Peso Exchange ("BMPE")[1] operation benefitting a Latin American drug trafficking organization ("DTO").

---

[1] A BMPE is a specific form of trade-based money laundering, which is an umbrella term used to describe the many ways money laundering organizations ("MLOs") can manipulate business records, import/export records, and other business processes to hide narcotics proceeds within seemingly legitimate enterprises that conduct international business.

16.    BMPE activities usually have the following indicators:

- Shell corporations that lack any internet presence but claim to be in an industry heavily associated with international commerce (electronics, textiles, etc.).

- Interstate cash deposits occurring on the same day or within a narrow timeframe.

- Significant and repetitive cash deposits and/or Currency Transaction Reports, peer-to-peer bank transfers, or deposits that otherwise seem unusual for the given industry.

- Immediate wire transfers after receiving cash deposits to high-risk countries in Latin America.

- Use of pass-through accounts to conceal the origin and destination of narcotics proceeds.

- Discrepancies on wire transfer memo lines - for example, one wire transfer memo line may state "purchase of hand sanitizer," while the next memo line states "purchase of used vehicles."

- Periods of high-volume activity (deposits and wire transfers) followed by periods of cessation of activity.

- Foreign visitors to the United States opening bank accounts while on

temporary or restricted statuses.

17.    HSI identified several individuals involved in the bulk deposits of cash into various bank accounts. One of these individuals, a Source of Information ("SOI"), admitted depositing millions of dollars into bank accounts associated with several U.S.-based companies in 2020.

18.    On or about December 15, 2020, HSI located SOI's vehicle, which was later seized by a vehicle repossession company. The repossession company provided HSI with consent to search the car.

19.    Inside the vehicle, HSI investigators found a large stack of bank deposit slips from JPMorgan Chase, Bank of America, and PNC Bank, as well as a receipt for a wire transfer at a money services business.

20.    According to the SOI, she/he received and deposited bulk cash for a money laundering organization ("MLO") over an extended period of time.

21.    The SOI conducted that activity under the direct control of a Mexican DTO, which the SOI believed to be the Mexican Los Zetas Cartel.

22.    The SOI claimed she/he was recruited in early 2020, hoping to make extra money and working more stable hours.

23.    As a condition of accepting the recruiter's job, the SOI was required to bring on one additional person to assist with the work.

24.     The SOI recruited an individual (hereinafter, "CC1").

25.     The SOI and CC1 left their jobs, received airplane tickets from their recruiter, and traveled to Atlanta, Georgia.

26.     In February or March 2020, the SOI and CC1 met with two unidentified individuals, as well as their recruiter, at an Atlanta restaurant.

27.     During the meeting, the two individuals informed the SOI and CC1 that they would receive large sums of cash daily, and that they were required to receive, count, identify, and remove counterfeit currency, then deposit the money into bank accounts.

28.     Soon thereafter, the SOI and CC1 received instructions as to which bank accounts they were to deposit the money, as well as training on how to conduct money pickups, search collected money for counterfeit currency, and how to prepare the collected money into $1,000 to $10,000 bundles for bank deposits.

29.     They were further instructed to keep the deposits under $10,000 to avoid "red flags" at the bank.

30.     The "red flag" reference likely related to the filing of a Currency Transaction Report which is required for bank transactions exceeding $10,000.

31.     Depositing money under $10,000 specifically to avoid the filing of a

Currency Transaction Report is a violation of 31 U.S.C. § 5324.

32.   After receiving their training, the SOI and CC1 began working without supervision.

33.   The SOI and CC1, working in tandem, received daily text messages with instructions to pick up approximately $100,000 to $250,000 of currency, usually in parking lots of retail stores.

34.   The SOI and CC1 then deposited the money in various bank accounts.

35.   After a few weeks of depositing money, the SOI felt that she/he had made a mistake in accepting this work opportunity, and within a few weeks the SOI realized that she/he was likely working for a Mexican DTO or MLO to launder drug proceeds.

36.   Because the SOI conducted money pickups from different individuals, and the money was so excessive in quantity, the SOI realized that there was no legitimate business purpose for the activity, and she/he was in fact laundering drug proceeds.

37.   The SOI received a 1% commission on the money she/he deposited into the bank accounts. The MLO set that commission rate.

38.   As part of the money laundering process, the SOI and CC1 would

first provide pictures of U.S. dollar bill serial numbers in their possession to the MLO.

39.     The SOI and CC1 would then receive instructions from the MLO to meet a money courier in a public parking lot.

40.     Upon meeting the courier, SOI and CC1 would provide one of the specific U.S. dollar bill serial numbers to the money courier to confirm their identity for the exchange of the cash.

41.     The SOI and CC1 would then count the money and receive specific instructions into which bank accounts they were to deposit the funds.

42.     The SOI and CC1 used "burner" phones to text pictures of the cash and deposit receipts to their handlers working for the MLO.

43.     The SOI and CC1 also utilized an encrypted phone application, which automatically deletes the messages after a certain time, to communicate with the MLO.

44.     The SOI and the CC1 traveled between Atlanta and several large metropolitan cities in the United States to engage in this activity.

45.     The MLO determined where to send the SOI and CC1 based on which cities were "dry," or lacking a significant amount of drug proceeds to launder.

46.     The SOI and CC1's travel, lodging, and occasional food expenses were paid by the MLO.

47.     The SOI stated that CC1 recruited three additional individuals ("CC2", "CC3", and "CC4").

48.     The SOI and CC1, CC2, CC3, and CC4 continued money laundering until on or around September 21, 2020 when investigators with the Drug Enforcement Administration ("DEA") encountered CC1 and CC2 in Chicago, Illinois.

49.     DEA investigators arrested CC2 and a Mexican national and seized approximately $200,000 in bulk cash from them.

50.     Investigators found CC1 that same day at a residence in Chicago, Illinois, and CC1 provided consent for the DEA to search the residence.

51.     During the search, investigators located $15,000 in bulk cash, financial ledgers that showed deposit activity, multiple small backpacks and suitcases, a money counter, and bank deposit slips.

52.     Among these items were financial ledgers and a bank deposit receipt detailing a bulk cash deposit of $5,000.00 into BoA 9707.

53.     DEA investigators conducted a consensual interview of CC1, during which CC1 admitted to picking up and laundering between $1 and $2 million in

Atlanta, Georgia and approximately $1 million in Chicago, Illinois in 2020.

54.    When asked if CC1 knew where the money came from, CC1 stated

that he/she wasn't sure but believed it was possibly narcotics related.

55.    Following CC1's encounter with DEA investigators, SOI continued

to work with another Spanish-speaking individual to pick up and launder bulk

cash in other parts of the United States until December 2020.

56.    The SOI and the co-conspirators did not have any legitimate income

during the timeframe in which they conducted this activity.

57.    As such, there were no legitimate sources for any of the bulk cash

that SOI and the co-conspirators deposited into the Bank of America account

number XXXXXXXX9707, held in the name of Alberto Cortes Cosmetics and

Perfumes Inc. ("BoA 9707").

58.    HSI investigators obtained DEA reports regarding an undercover

money pickup operation conducted by the DEA that ultimately resulted in

suspected narcotics proceeds being deposited into BoA 9707. The undercover

operation, conducted on or about September 5, 2018 in New Rochelle, New York,

involved $406,990 in suspected narcotics proceeds. After receiving the money,

DEA investigators received wiring instructions from a Mexico-based BMPE peso

broker potentially working on behalf of the DTO Jalisco New Generation Cartel.

The peso broker sent instructions to deposit $10,020 of the proceeds into BoA

9707, which occurred on or about September 7, 2018.

B.  **The BoA 9707 Bank Account**

59.    A review of BoA 9707's financial records showed that the account

belongs to Alberto Cortes Cosmetics and Perfumes Inc ("Alberto Cortes").

60.    Alberto Cortes was incorporated on October 7, 1981 and holds a

physical retail location at 272 E Flagler Street, Miami, Florida 33131.

61.    BoA 9707 records reveal numerous red flags for BMPE activity,

including the following:

- BoA 9707 received 35 cash deposits, all under $10,000, totaling

  $121,835.24. These deposits were made in the Northern District of

  Georgia, California, New York, Florida, Michigan, Texas, Illinois,

  and Virginia.

- BoA 9707 received 305 incoming peer-to-peer transfers from

  individuals and organizations totaling $493,872.60. These deposits

  came from organizations associated with different industries, such

  as painting and cleaning services, logistics, and investment

  corporations.

- BoA 9707 received 302 incoming wire transfers totaling $3,160,914.72

from multiple individuals and organizations. These deposits came from organizations associated food redistribution, automotive parts, freight forwarding, and agriculture.

- Some of the wire transfers included memo lines noting the purchase of items that appeared to be unrelated to the company's business, such as "ground limestone" and "veterinarian product."

- Funds entered the account and were almost entirely transferred to other bank accounts held by the same owners, which is a consistent pattern for a pass-through account.

62.    On or about March 18, 2021, HSI seized the Defendant Funds.

63.    On or about May 21, 2021, Alberto Cortes Cosmetics and Perfumes Inc. filed a claim with CBP contending that it is the owner of the Defendant Funds.

64.    The Defendant Funds are subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6) on the grounds that they were furnished or were intended to be furnished in exchange for a controlled substance, that they constitute proceeds traceable to such an exchange, or that they were used or were intended to be used to facilitate the sale or exchange of a controlled substance in violation of 21 U.S.C. §841.

65.     The Defendant Funds are also subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6) on the grounds that they were furnished or were intended to be furnished in exchange for a controlled substance, that they constitute proceeds traceable to such an exchange, or that they were used or were intended to be used to facilitate an attempt or conspiracy to commit the sale or exchange of a controlled substance in violation of 21 U.S.C. § 846.

66.     The Defendant Funds are subject to forfeiture to the United States pursuant to 18 U.S.C. §981(a)(1)(A) because they were involved in or are traceable to a money laundering transaction or an attempted money laundering transaction in violation of 18 U.S.C. §§ 1956 and/or 1957.

67.     The Defendant Funds are subject to forfeiture to the United States pursuant to 18 U.S.C. §981(a)(1)(C) because they constitute or were derived from proceeds traceable to a specified unlawful activity – the illegal distribution of controlled substances.

WHEREFORE, Plaintiff prays:

(1)     that the Court forfeit the Defendant Funds to the United States of

America;

(2)     that the Court award Plaintiff the costs of this action; and

(3)     that Plaintiff have such other and further relief as the Court deems

just and proper under the facts and circumstances of this case.

This 23rd day of July, 2021.

                              Respectfully submitted,

                              **KURT R. ERSKINE**
                                 *Acting United States Attorney*

                              /s/ Radka T. Nations
                              **RADKA T. NATIONS**
                                 *Assistant United States Attorney*
                              Georgia Bar No. 618248
                              75 Ted Turner Drive, SW
                              Suite 600
                              Atlanta, GA 30303
                              Telephone: (404) 581-6000
                              Radka.Nations2@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

     *v.*

$259,768.11 IN FUNDS SEIZED FROM BANK OF
AMERICA ACCOUNT NUMBER XXXXXXXX9707
HELD IN THE NAME OF ALBERTO CORTES
COSMETICS AND PERFUMES INC,

     Defendants.

CIVIL ACTION NO.

## **VERIFICATION OF COMPLAINT FOR FORFEITURE**

I, Special Agent John D. Walker, have read the Complaint for Forfeiture in this action and state that its contents are true and correct to the best of my knowledge and belief based upon my personal knowledge of the case and upon information obtained from other law enforcement personnel.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

This 23rd day of July, 2021.

_____
**Special Agent John D. Walker**
United States Department of Homeland Security
Homeland Security Investigations